1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

SARA R. HAYDEN,

    Plaintiff,

v.

NANCY BERRYHILL,

    Defendant.

Case No. 18-cv-01198-LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 15, 18

### INTRODUCTION

Plaintiff Sara Hayden seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for disability-insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416 and 423.[1] She moved for summary judgment, and the Commissioner opposed the motion and filed a cross-motion for summary judgment.[2] All parties consented to magistrate-judge jurisdiction.[3] Under Civil Local Rule 16–5, the matter is submitted

---

[1] Compl. – ECF No. 1 at 9; Cross-Mot. – ECF No. 18 at 5. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 15; Cross-Mot. – ECF No. 18.

[3] Consent Forms – ECF Nos. 7, 8.

for decision by this court without oral argument. The court grants the plaintiff's motion for summary judgment.

**STATEMENT**

**1. Procedural History**

On July 14, 2011, the plaintiff, then 48 years old, filed an application for disability-insurance benefits under Title II of the Social Security Act.[4] The plaintiff alleged the following conditions: major depressive disorder, inability to concentrate, difficulty retaining new information, rheumatoid arthritis, neck pain, and Sjoren's syndrome.[5] She had been unable to work since January 20, 2010.[6] The agency denied the plaintiff's application in March 2012 and upon reconsideration in August 2012.[7] The plaintiff requested a hearing, which was held on February 28, 2013.[8] The ALJ in Arizona denied the plaintiff's application.[9] The plaintiff appealed the decision to the District of Arizona, which remanded the case for further proceedings on March 25, 2016.[10] The Appeals Council vacated the earlier decision and remanded the case to an ALJ in California.[11] The new ALJ held a hearing on April 26, 2017 and issued a decision finding the plaintiff not disabled on October 24, 2017.[12]

---

[4] Compl. – ECF No. 1 at 9; Cross-Mot. – ECF No. 18 at 5.

[5] Administrative Record ("AR") 80; The plaintiff initially alleged an onset date of September 24, 2009, but later amended the onset date to January 20, 2010. *See* AR 10, 164.

[6] AR 80.

[7] AR 116–19, 121–23.

[8] AR 25.

[9] AR 10–19.

[10] AR 974.

[11] AR 977.

[12] AR 852–61.

The plaintiff timely filed this action for judicial review and filed a motion for summary judgment.[13] The Commissioner filed a cross-motion for summary judgment.[14]

## 2. Summary of Administrative Record

### 2.1 Medical Records

#### 2.1.1 Catalina Pointe Arthritis & Rheumatology Specialists — Treating

On January 3, 2013, Physician's Assistant Carol Tran noted that the plaintiff was "doing fairly well in terms of her RA [meaning rheumatoid arthritis]" and that "stiffness" lasted "anywhere from 2 minutes to 1 hour."[15] The plaintiff reported that Orencia was "helping significantly."[16] On February 27, 2013 Michael Maricic, M.D., examined the plaintiff.[17] Her chief complaint was "right wrist pain and swelling."[18] Dr. Maricic administered injections of corticosteroids and Xylocains.[19]

#### 2.1.2 Santsaran Patel, M.D. — Treating

The plaintiff visited the Patel Medical Clinic on February 21, 2013, complaining of pain in her forearms and hands.[20] Nurse Practitioner Ellen Lintner observed that the plaintiff was "well developed, well nourished, well groomed, [in] no apparent distress, [and] seem[ed] to be in mild pain."[21] On May 28, 2013 the plaintiff was positive for "fatigue" and "excruciating calf pain."[22] Nurse Lintner noted a decreased range of motion and pain in her left knee.[23] On June 18, 2013, the

---

[13] Compl. – ECF No. 1; Mot. – ECF No. 15.

[14] Cross-Mot.– ECF No. 18.

[15] AR 1089.

[16] *Id.*

[17] AR 1093.

[18] *Id.*

[19] AR 1094.

[20] AR 1104.

[21] AR 1106.

[22] AR 1109.

[23] AR 1112.

United States District Court
Northern District of California

plaintiff "present[ed] with numbness" of "moderate intensity" and "lumbar back pain."[24] Nurse Lintner noted that the plaintiff had "a long history of back problems" and had been lifting boxes in preparation for her move to California.[25]

Dr. Patel and Nurse Lintner sent the plaintiff to Sierra Vista Regional Health Center for tests and imaging.[26] An ultrasound on May 30, 2013 showed a "large popliteal cyst" that extended "down to the calf region."[27] An MRI on June 25, 2013 showed a "moderate degree of spinal stenosis."[28]

### 2.1.3    Melissa Lim, M.D. — Treating

The plaintiff saw Dr. Lim on January 25, 2015.[29] The plaintiff complained of "fatigue, shortness of breath, asthma, and obstructive sleep apnea."[30] After examination, Dr. Lim diagnosed the plaintiff with mild obstructive-pulmonary disease.[31]

### 2.1.4    Cynthia Furze, Ph.D. — Treating

Dr. Furze has been the plaintiff's treating psychologist since 2008.[32] In February 2013, Dr. Furze submitted a medical-source statement.[33] The form required Dr. Furze to rate the plaintiff's ability to perform a number of work-related tasks on a scale of "not significantly limited" to "markedly limited."[34]

---

[24] AR 1115.

[25] AR 1118.

[26] AR 1120–32.

[27] AR 1120.

[28] AR 1121–22.

[29] AR 1198.

[30] Id.

[31] Id.

[32] AR 1550.

[33] AR 781–83.

[34] Id. The definitions provided for the rating scale were as follows: "not significantly limited" means that the claimant has the ability to perform the activity in a normal work setting; "mildly limited" means the claimant is occasionally unable to adequately perform the activity; "moderately limited" means the claimant is frequently unable to adequately perform the activity, but could perform it 50% of the time; and "markedly limited" means the claimant is unable to perform the activity at all or is

Dr. Furze rated the plaintiff as "not significantly limited" in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.[35]

She rated the plaintiff as "mildly limited" in the ability to maintain attention and concentration for brief periods, the ability to ask simple questions or request assistance, the ability to be aware of normal hazards and take appropriate precautions, and the ability to travel in unfamiliar places or use public transportation.[36]

She rated the plaintiff as "moderately limited" in the ability to remember locations and work-like procedures, the ability to carry out short and simple instructions, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and the ability to respond appropriately to changes in the work setting.[37]

She rated the plaintiff as "markedly limited" in the ability to understand and remember short, simple instructions, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to complete a workday and a workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without more than the normal rest periods, and the ability to set realistic goals or make plans independently of others.[38]

---

unable to perform it more than 50% of the time. There was also an option to mark "not ratable on available information".

[35] AR 782.

[36] AR 781–83.

[37] *Id.*

[38] *Id.*

Dr. Furze reported that the plaintiff could work zero hours per day.[39] The limitations indicated in the report were effective in 2009 and were "ongoing."[40] Dr. Furze opined:

> [The plaintiff's] relative strength with respect to social interactions does not mitigate her impairments in memory, concentration, and planning which render her unable to work in any capacity at the present time. The impact of her depression and resulting cognitive impairments is worsened by her chronic and multiple medical problems.[41]

In May 2013, Dr. Furze submitted a letter in response to the ALJ's unfavorable decision.[42] Dr. Furze wrote that since January 2010, the plaintiff was "unable to perform sustained attentional and cognitively-focused work of any kind. She has also become socially withdrawn, unable to maintain her physical fitness and significantly impaired in her basic self-care and personal grooming."[43] Dr. Furze opined, "The nature of [the plaintiff's] impairment is chronic and ongoing since January of 2010, despite aggressive and ongoing psychological and psychiatric intervention."[44] Dr. Furze rejected the notion that the plaintiff's depression was reactive to situational issues in her life, writing, "[w]hile [the plaintiff] ha[d] additionally experienced some significant life stressors . . .[,] the depression preexisted these events and has continued throughout this period up to the present time."[45] She clarified that "[a]s a routine matter," she did not use her clinical notes as "an ongoing documentation of symptoms for the patient" and so the "absence of observations regarding functioning in [her] office notes [did] not mean that they were absent in the patient."[46]

In an undated letter "addressing two issues" related to the plaintiff's case, Dr. Furze wrote:

> Regarding the issue of [the plaintiff's] being assessed as "well groomed" in some of the other doctors' records. It is a standard part of a medical exam. . . to note the

---

[39] AR 783.

[40] *Id.*

[41] *Id.*

[42] AR 847–48.

[43] AR 847.

[44] *Id.*

[45] *Id.*

[46] AR 848.

patient's appearance. This can reflect a general observation that the person appears normal. It is not an in-depth comment on the person's appearance. What would usually qualify for further note-taking would be obvious signs of inability to function: tattered clothing, smears of dirt on the face or body, matted hair, untied shoelaces, glasses held together by tape, etc.. [The plaintiff] presents herself as a normal-appearing woman. Her hair is straight and she has a pleasant smile and manner. She rarely sweats and has little body odor. Her hair is dry and disinclined to appear dirty, even if she doesn't shampoo it for several weeks. . . . These other physicians' notes reflect a quick and general standard note for the record that was not accompanied by asking questions.[47]

Dr. Furze noted that when the plaintiff was flying back and forth from California and Arizona, she was "struck by [the plaintiff's] inability to check other airlines or prices" and the plaintiff "had relatives, her father specifically, who would make travel arrangements for her."[48]

On December 27, 2016, Dr. Furze submitted an additional letter, reporting that the plaintiff had suffered from depression since 2008.[49] Dr. Furze "treated the plaintiff for psychological issues related to her rheumatoid arthritis prior to the depression" and so was "in a unique clinical position to observe her loss of functioning since 2009."[50] It was "apparent" to Dr. Furze that the plaintiff was "unable to work and [was] among the most severely impaired by mental illness patients (outside of psychotic disorders) that [she had] seen in thirty years of practicing psychology."[51]

### 2.1.5    David L. Smith, M.D. — Treating

Dr. Smith is the plaintiff's treating psychiatrist.[52] Dr. Smith submitted a letter on February 12, 2013 indicating that he "reviewed the diagnostic criteria for depression listed on Social Security regulation 12.04 and the plaintiff meets or exceeds the listed criteria."[53]

---

[47] AR 1683.

[48] AR 1684.

[49] AR 1550.

[50] *Id.*

[51] *Id.*

[52] AR 1592.

[53] AR 652.

Dr. Smith submitted a medical-source statement on April 3, 2017.[54] He reported that the plaintiff had "a long history of chronic major depression."[55] Her symptoms "wax[ed] and wane[d]" but she had "a chronic underlying component of neurovegetative symptoms" including "poor energy, poor concentration, lower interest level in typically enjoyable activities (anhedonia), and problems with poor sleep quality."[56] Medication improved these symptoms but "even with medication treatment she still ha[d] residual dysthymic-level symptoms (lower level but chronic depression) that contribute[d] to her disability and difficulty with cognitive and emotional functioning well enough to work."[57]

The plaintiff's symptoms caused "clinically significant restriction in maintaining concentration, persistence or pace and social functioning as evidenced by difficulty following directions, following a conversation, or following a television show because she does not comprehend or retain the information."[58] She often did not leave the house and tended to isolate.[59]

### 2.1.6    Sports, Orthopedics and Rehabilitation Medicine Associates — Treating

The plaintiff received treatment for rheumatoid arthritis at Sports, Orthopedics and Rehabilitation Medicine Associates ("SOAR") beginning in 2002.[60]

### 2.1.6.1    Nichole Barry, M.D.

On March 16, 2010 and May 15, 2012, Dr. Barry aspirated fluid from the plaintiff's knee.[61] On June 28, 2012, Dr. Barry reported that the plaintiff's knees were swelling, one knee was very

---

[54] AR 1592.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] AR 785.

[61] AR 817.

painful, and she had a "mild flare."[62] On July 24, 2012, Dr. Barry examined the plaintiff and aspirated a recurring cyst in her knee.[63]

On July 9, 2013, Dr. Barry aspirated fluid from a cyst in the plaintiff's knee and injected Kenalog and lidocaine.[64] Dr. Barry's impression was "[r]heumatoid arthritis with ongoing activity also manifested by synovitis in the right knee leading to the development of a popliteal cyst."[65] On August 6, 2013, Dr. Barry reported "deep" pain in the plaintiff's shoulder.[66] On August 28, 2013, Dr. Barry reported wrist pain.[67] On September 13, 2013, Dr. Barry performed an ultrasound and injection in the plaintiff's left wrist.[68] The plaintiff had been experiencing a significant flare.[69] Dr. Barry noted that the plaintiff had "failed all TNF inhibitors including Remicade and Humira."[70]

On September 13, 2013, Dr. Barry noted "moderate swelling" in the plaintiff's left wrist.[71] Her impression was that she had "active polysynovitis related to her rheumatoid arthritis, now complicated by secondary carpal tunnel syndrome as well."[72] Dr. Barry administered a lidocaine injection.[73] Dr. Barry ordered repeated medication infusions to treat the plaintiff's rheumatoid arthritis.[74]

---

[62] AR 816.

[63] AR 815.

[64] AR 1250.

[65] AR 1251. "Synovitis is '[i]nflammation of the synovial membrane, the lining of the joint.'" *Spencer v. Barnhart,* No. 04-876 RHS, 2005 WL 8163728 at *3 n.3 (D. New Mexico, July 18, 2005) (citations omitted).

[66] AR 1248.

[67] AR 1245.

[68] AR 1240.

[69] *Id.*

[70] AR 1241.

[71] AR 1133.

[72] *Id.*

[73] *Id*.

[74] *See, e.g.,* AR 1224–47.

### 2.1.6.2    Robert S. Gamburd, M.D.

On March 9, 2012, Dr. Gamburd reported that the plaintiff "had a flare of radicular pain in the right leg."[75] He reported that she had "no pain with straight left raising or femoral stretch testing" but did have "pain with lumbar extension and with right-sided bending."[76] He ordered an epidural because she had "excellent relief previously" from that treatment.[77]

The plaintiff saw Dr. Gamburd on December 14, 2012 for a recheck of her neck pain.[78] The plaintiff experienced "increased clicking and instability sensation in the low neck," and her "rheumatoid arthritis [had] been aggravated in her wrist and swollen."[79] She had numbness and tingling in her forearm.[80] Dr. Gamburd's examination revealed "painful" cervical spine rotation.[81]

### 2.1.7    Serena Hu, M.D. — Treating

Dr. Barry referred the plaintiff to Dr. Hu at the University of California, San Francisco ("UCSF") Department of Orthopedic Surgery for issues related to pain in her neck.[82]

On September 16, 2008, Dr. Hu noted that the plaintiff had "some upper thoracic pain that occasionally radiate[d] into the arms, back and elbow, worse on the left than the right. Her hands go numb and give her pain, and result in decreased activity."[83] She reported swelling in the plaintiff's neck and low back pain.[84] Dr. Hu wrote that "given the current medical management of" the plaintiff's rheumatoid arthritis, "it would be very reasonable for her not to need any more aggressive treatment."[85]

---

[75] AR 819.

[76] *Id.*

[77] *Id.*

[78] AR 813.

[79] *Id.*

[80] *Id.*

[81] AR 814.

[82] AR 821.

[83] AR 829.

[84] *Id.*

[85] AR 830.

On July 6, 2009, Dr. Hu reported "catching" in the plaintiff's neck but said that otherwise, her rheumatoid arthritis was "under control with conservative treatment."[86]

On July 12, 2010, Dr. Hu noted that the plaintiff "had been in remission for about five years" but had a recent significant flare-up.[87] Dr. Hu's clinical examination was "unremarkable," and the plaintiff's "range of motion [was] essentially full and not painful."[88] Dr. Hu planned to follow up in one year.[89]

### 2.1.8    Sequoia Hospital — Treating

The plaintiff made multiple trips to the emergency room ("ER") at Sequoia Hospital in Redwood City, California. On April 3, 2010, she visited the ER complaining of an "[e]pisode of shakiness, diaphoresis, [and] vomiting."[90] Gary D. MacGregor, M.D., noted his impression as "possible drug reaction in the tramadol and Cymbalta combination."[91] The plaintiff's symptoms resolved with rehydration and she was discharged.[92]

On October 31, 2013, the plaintiff presented at the ER with "low back pain mainly on the right side."[93] She reported taking four tablets of hydrocodone and Aleve and applying ice "without much relief."[94] Physician's Assistant Putnam administered Diluadid, Phenegan, and Valium, which made her feel better.[95] Physician's Assistant Putnam's clinical impression was "acute-on-chronic back pain" and she sent the plaintiff home with a prescription for Valium.[96]

---

[86] AR 827.

[87] AR 821.

[88] Id.

[89] Id.

[90] AR 823.

[91] AR 824.

[92] Id.

[93] AR 1141.

[94] Id.

[95] AR 1142.

[96] Id.

### 2.1.9 Gregory Engel, M.D. — Treating

On September 12, 2013, the plaintiff had an appointment with Dr. Engel.[97] She complained of "stomach and epigastric pain which" radiated up.[98] Dr. Engel noted that the plaintiff's "blood pressure" was "clearly inadequately controlled" and that he would "follow closely."[99] He determined that her pain did not "appear to be cardiac."[100]

On December 11, 2014, Dr. Engel reported that the plaintiff was "still having dyspnea which has been getting worse since her last visit."[101] She was "well appearing" and in "no acute distress."[102] The plaintiff saw Dr. Engel again on March 27, 2014.[103] She was "well appearing" and "in no acute distress."[104] He increased the dosage of her blood-pressure medication.[105]

On February 27, 2015, Dr. Engel noted the plaintiff's blood pressure was "within a normal range with a couple [of] borderline readings."[106] She reported "exertional dyspnea with walking or folding laundry."[107] On October 8, 2015, Dr. Engel reported that the plaintiff's "breathing problems [had] improved but [had] not resolved completely" and observed that she was "well appearing" and in "no acute distress."[108]

---

[97] AR 1160–63.

[98] AR 1160.

[99] AR 1163.

[100] AR 1162.

[101] AR 1213. "Dyspnea refers to the sensation of difficult or uncomfortable breathing." *Neal v. Colvin*, No. 1:14-01503-SKP, 2015 WL 5232328, at *1 n.3 (E.D. Cal. Sept. 8, 2015) (citing *Dorland's Illustrated Medical Dictionary* 589, 1359 (31st ed. 2007)).

[102] AR 1215.

[103] AR 1155.

[104] AR 1157.

[105] AR 1158.

[106] AR 1206.

[107] *Id.*

[108] AR 1201, 1203.

### 2.1.10   Bryan Gesuk, M.D. — Treating

Dr. Gesuk has treated the plaintiff for her rheumatoid arthritis at the San Mateo Medical Center since February 2015.[109] Dr. Gesuk submitted a "Medical Work Tolerance Recommendations" form.[110] Dr. Gesuk indicated that the plaintiff could do two hours of sedentary work per day, one hour of light work per day, and no hours of medium or heavy work per day.[111] The plaintiff could stand for five minutes at one time and could sit for ten minutes at one time.[112] The plaintiff would have to change positions frequently during the day (at least once per hour).[113] She could climb one flight of stairs per day.[114] The plaintiff needed to avoid bending, crouching, and squatting, and she could occasionally kneel, sit in a clerical position, reach above shoulder level, and work with arms extended in front.[115] She needed to avoid power gripping, pushing and pulling, but could occasionally pinch with her thumb and index finger, perform fine movements, and feel/touch where sensation was required.[116] Dr. Gesuck concluded that the plaintiff could work three hours per day and two days per week.[117]

## 2.2   Non-Medical Evidence

### 2.2.1   Norman Bell

Mr. Bell was the plaintiff's supervisor at the San Jose Business Journal from 2007 to 2010.[118] Mr. Bell described the accommodations he made for the plaintiff, including a handicapped-parking spot, ergonomic restructuring of her workspace, and providing her with a flexible schedule.[119] It

---

[109] AR 1287–1547.

[110] AR 1712.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] AR 1713.

[116] *Id.*

[117] *Id.*

[118] AR 227.

[119] *Id.*

was "not uncommon to find [the plaintiff] stretched out on the floor, straightening her back."[120] Her lack of mobility limited her typing, and it was "clear she was frequently in pain from the simple act of walking."[121] When in pain, the plaintiff "could be a challenge to those around her," but she "recognized that and made efforts to avoid conflict."[122]

### 2.2.2 Maria Pazos

Ms. Pazos worked with the plaintiff at the San Jose Business Journal from 2004 to 2008.[123] Ms. Pazos detailed the difficulties that the plaintiff had at work due to her rheumatoid arthritis.[124] The plaintiff had difficulty "maintaining a regular schedule due to a huge number of doctor visits and medicine adjustments" but "was a real trooper" and made up the time "at all sorts of hours."[125] The plaintiff had swelling in her hands, and sustained typing was painful.[126] "Towards the end" of her time there, the plaintiff "was in extreme discomfort pretty much all day."[127]

### 2.2.3 Karen Bell-Zinn

Ms. Bell-Zinn worked with the plaintiff at the Phoenix Business Journal in the 1990s, and they remained friends after that.[128] The plaintiff "had physical stamina, and as a member of the editorial department. . . was one of [the] best copy editors."[129] Ms. Bell-Zinn documented changes she saw in the plaintiff beginning in the early 2000s.[130] The plaintiff "was slower to get around, and by 2005, her stamina was extremely low."[131] She also "became somewhat forgetful and

---

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] AR 1079.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] AR 1081.

[129] *Id.*

[130] *Id.*

[131] *Id.*

withdrawn."[132] In the "past decade," the plaintiff seemed "more and more forgetful and even somewhat disoriented."[133] Ms. Bell-Zinn believed that the plaintiff was "unable to have the vibrant life and career that she began before her illness took away her future."[134]

### 2.2.4 Timothy Roberts

Mr. Roberts worked with the plaintiff at the San Jose Business Journal.[135] They both "worked long hours and did hard work during a very challenging period for the newspaper."[136] He described the plaintiff's work as "a lot of computer work, phone calls, faxing and note taking."[137] She also "present[ed] her plans for each edition of the paper at staff meetings, coordinate[d] with reporters and editors, guide[d] reporters on their own research and proofread the final edit of the main news pages."[138] The plaintiff worked "energetically the first two years, but in 2002 she "began to experience pain and tiredness."[139] The plaintiff "did whatever she could to stay up with work," including working late and on the weekends.[140] The plaintiff's "hands were swollen and it was clear that she walked with pain."[141] It was painful for Mr. Roberts to "watch her stiff walking and painful typing."[142] Once, the plaintiff came into work the day after being treated at the hospital for anaphylactic shock.[143] It took the plaintiff "longer and longer to get her work done."[144] By 2008, the "new publisher was not interested in working with Sara" and fired her in 2008.[145]

---

[132] Id.

[133] Id.

[134] Id.

[135] AR 1083.

[136] Id.

[137] Id.

[138] Id.

[139] Id.

[140] Id.

[141] Id.

[142] Id.

[143] Id.

[144] Id.

[145] Id.

### 2.2.5    Function Report

The plaintiff completed a Function Report in conjunction with her application for disability benefits on December 2, 2011.[146]

Before her conditions, the plaintiff was able to read complex texts, problem solve, complete tasks, supervise the work of others, follow directions, and converse intelligently.[147] As a result of her conditions, she "easily [lost] track of things" and experienced a "loss of vocabulary and comprehension [and had] difficulty concentrating" and "difficulty finishing tasks."[148] Emailing took "an unreasonable amount of time."[149] For most of the day, she stayed "in bed watching TV."[150] "Sometimes she move[d] to the sofa to watch TV."[151]

Her meals were "sporadic," and she occasionally went to the store or the doctor, and sometimes "visit[ed] her father."[152] She bathed about two times a month and had not changed her bed sheets in months.[153] She needed to be told to bathe but did not "have anyone to do that."[154] She had to set reminders on her phone to remember to take medication.[155] She was "partially able" to do household chores, but she either forgot or was "not motivated."[156] She went outside "maybe once a day."[157]

---

[146] AR 192–200.

[147] AR 193.

[148] AR 192.

[149] AR 193.

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] AR 194.

[154] *Id.*

[155] *Id.*

[156] AR 195.

[157] *Id.*

Her conditions negatively affected her ability to handle money.[158] Her hobbies and interests were "reading" and "writing fiction" but she "almost stopped because [she got] frustrated when [she did not] understand text and [her] creativity was gone."[159] The plaintiff used "Skype to talk to friends" and visited in person "once in a while."[160] She did not "enjoy leaving home" and "stopped going to book club, lectures, classes, bookstores, the library, [and] window shopping."[161]

The plaintiff's conditions affected talking, memory, completing tasks, concentrating, understanding, and following instructions.[162] She felt like her brain was "injured."[163] She could walk for 45 minutes without having to stop and rest, and she needed to rest for "a day" before walking again.[164] She could follow written instructions "with great difficulty" and could not follow spoken instructions.[165] She did not handle stress well and did not have any routines.[166] She was "afraid of dealing with money and legal issues."[167]

The plaintiff noted that she "had rheumatoid arthritis for 9 years" and that it exacerbated her depression and sometimes gave her "suicidal ideation."[168] She said she used to be a great self-starter with lots of ambition and motivation" but now she was "none of that."[169]

---

[158] AR 196.

[159] Id.

[160] Id.

[161] AR 196–97.

[162] AR 197.

[163] Id.

[164] Id.

[165] Id.

[166] AR 198.

[167] Id.

[168] AR 199.

[169] AR 199–200.

**3. Administrative Hearing Held February 28, 2013**

**3.1  Plaintiff's Hearing Testimony**

The plaintiff appeared and testified at a hearing on February 28, 2013, represented by an attorney.[170] The plaintiff clarified that her disability onset date was January 20, 2010 (not September 24, 2009, as she originally claimed).[171]

The ALJ questioned the plaintiff. She testified that she had not worked at all since January 20, 2010.[172] She felt like she had "brain damage" and her brain did not "connect the dots the way it did" before.[173] The ALJ asked whether any health provider used that term (brain damage), and the plaintiff said "no, that's what it feels like to me . . . inside my head."[174] She found it "very difficult to concentrate and to focus" and had "extreme difficulty reading and writing."[175] Her psychiatrist told her that this was a "neurodegenerative aspect of depression."[176] The plaintiff was not sure why she was depressed, but she had "a rough year the year before 2008 or two years before 2008," and her psychiatrist said that "eventually [they would] find the right cocktail of drugs that [would] get [her] back on track and [she could] go back to being productive someday."[177] She testified that she has been seeing her psychiatrist, Dr. Smith, since September 2009 and saw him "every three to five months or so."[178] She also saw her psychologist, Dr. Cynthia Furze, twice per week for "seven or eight years."[179]

---

[170] AR 25.

[171] AR 29–30.

[172] AR 30.

[173] AR 30–31.

[174] AR 33.

[175] AR 30–31.

[176] AR 31.

[177] *Id.*

[178] *Id.*

[179] AR 32.

The plaintiff testified that her rheumatoid arthritis and stomach problems kept her from working.[180] She was diagnosed with gastroparesis.[181] Her doctor in Tucson thought she had internal bleeding and was running tests to see where the bleeding was coming from.[182]

The ALJ asked whether the plaintiff's health improved or got worse between January 20, 2010 and the date of the hearing.[183] She responded that her stomach was "definitely worse."[184] Her joints were "flaring more often," and she had "numbness in [her] hands from [the] wrist down. Both of [her] hands [went] completely numb during the day."[185] She experienced "very intense bone depth dull pain" in her forearms several times a day, usually lasting 10 or 15 minutes.[186] Her neck pain was worse.[187] Her "overall mood" had improved since her onset date, and she did not "have as much crying as [she] did when" she initially "got depression."[188] She used to weigh over 200 pounds, but now she weighed "about 190."[189]

The ALJ asked the plaintiff about litigation she was involved in with her deceased mother's widower over her mother's estate.[190] She won that litigation.[191] She also filed a lawsuit against her last employer because they did not give her appropriate accommodations for her rheumatoid

---

[180] AR 33.

[181] *Id.* "Gastroparesis is a digestive disorder wherein the gastric system does not empty food properly." *Proof v. Intel Corp. Long Term Disability Plan,* No. 2:12-cv-01716-TLK-CKD, 2014 WL 4960927, at n.5 (E.D. Cal. Sept. 30, 2014) (citing Gastroparesis Overview: Causes & Symptoms, http://www.webmd.com/digestive_disorders/digestive-disorders-gastroparesis).

[182] AR 33–34.

[183] AR 35–36.

[184] AR 36.

[185] *Id.*

[186] *Id.*

[187] AR 37.

[188] *Id.*

[189] AR 39.

[190] AR 37–38.

[191] AR 38.

arthritis.[192] The suit was settled out of court.[193] The plaintiff testified that, at the time, if she had been given her accommodations, she could have still done that job.[194]

The ALJ asked the plaintiff whether she exercised, and she testified that she tried to "walk 20 to 30 minutes a few times a week."[195] Her occupation was listed as "writer," and so he asked whether she was currently working on anything.[196] She stated that she had not written anything of significance since 2009.[197] The ALJ asked whether the plaintiff experienced any side effects from her medications, and she said that one gave her "esophagitis" and the others made her nauseous, drowsy, sleepy, and sometimes dizzy.[198] The ALJ noted that in a report from one of her doctors, the plaintiff reported no side effects and asked her to explain the discrepancy.[199] She said that at the time, she did not have any "new side effects to report to him but he would have been aware of my previous side effects."[200]

The ALJ asked the plaintiff about her living situation and her travel. The plaintiff testified that she lived in Northern California in 2012 and moved to Sierra Vista Arizona in June 2011.[201] She traveled between Arizona and Northern California five times between June 2011 and the end of 2011 and four times in 2012.[202] She traveled to Redwood City, California "right before Christmas"

---

[192] *Id.*

[193] AR 39.

[194] *Id.*

[195] AR 43.

[196] *Id.*

[197] *Id.*

[198] AR 44.

[199] AR 45.

[200] *Id.*

[201] AR 35, 41.

[202] AR 41.

in 2012 to visit family and see her psychiatrist.[203] She eventually wanted to move back to California.[204]

The ALJ asked the plaintiff how her rheumatoid arthritis was doing.[205] She testified that "right now it's in a period of flaring. It goes up and down. . . But in the past few months it's been flaring fairly well, which among other things, has resulted in having all the swelling in my wrist and having to get injections there."[206] The ALJ pointed out a treatment note from January 3, 2013 that said the plaintiff was "doing fairly well in terms of her [rheumatoid arthritis] and stiffness can last anywhere from two minutes to one hour . . . She is able to do her activities of daily living."[207] He asked whether she remembered saying that.[208] She did not recall "saying that directly" but she spoke to a physician's assistant who "took some notes."[209]

The plaintiff's attorney then asked her questions. The plaintiff testified that she got an infusion once a month at the hospital for her rheumatoid arthritis.[210] The infusion took approximately two hours.[211] She also had to give herself injections.[212] Counsel asked the plaintiff what she meant when she told a doctor she was "doing okay" with her rheumatoid arthritis, and the plaintiff said she probably meant that "there's nothing new and wild coming at [her] and that it's just pretty much status quo."[213] If she had a flare, she would not necessarily tell her doctor because she has "had so many of them in the past and [she knew] what they would say. . . ."[214] Specifically,

---

[203] AR 47.

[204] AR 46.

[205] AR 47.

[206] Id.

[207] AR 47–48.

[208] AR 48.

[209] Id.

[210] AR 49.

[211] Id.

[212] Id.

[213] AR 50.

[214] Id.

counsel confirmed that at the January 3, 2013 appointment (raised by the ALJ), the plaintiff's doctor found that she had "synovitis, swelling in [her] left wrist and [her] fingers as well."[215]

The plaintiff tried to avoid getting steroid injections because they caused her mood to change and sometimes made her suicidal and made her "heart race."[216] The other medicines that she took, Orencia and methotrexate, suppressed her immune system.[217] To avoid infections, she had to "stay home, stay away from people, use Purell constantly and mostly just avoid contact with other people."[218]

Counsel asked the plaintiff why she maintained her team of doctors in California, and she said it was because she "had them for so long" and they knew "how [her] body work[ed]."[219] She moved to Arizona to be with her father (who died), and her intention was to move back to California but it was not financially possible at the time of the hearing.[220]

The plaintiff described accommodations that she was given at her former job.[221] She had a handicapped parking spot and was allowed to have a "sporadic" schedule.[222] She was allowed to stretch out on the floor when her back hurt.[223] She could use a keyboard for ten minutes (or for fifteen to twenty if her wrist was not hurting as badly).[224] Her fingers, hands, and wrists would get a "dull ache pain" and would get "a little more inflamed" if she overdid it on a keyboard.[225] When

---

[215] Id.

[216] AR 51.

[217] Id.

[218] AR 52.

[219] Id.

[220] AR 53.

[221] AR 54.

[222] AR 55–56.

[223] AR 56.

[224] AR 57.

[225] AR 57–58.

a new publisher joined the journal, he no longer allowed the plaintiff to have these accommodations.[226]

Finally, the plaintiff's attorney asked her to give the ALJ some examples from her daily life about how her "brain damage" impacted her.[227] She said she left things in the oven to cook and forgot about them and they burned.[228] She sometimes could not follow television shows, and it felt like "there [was] no root for" the information to "get to [her] brain."[229] She forgot to pay her bills and had her electricity and water and gas shut off.[230] She testified that she was working to get back to work and definitely did not want to "be like this forever."[231]

### 3.2   Vocational Expert

Ruth Van Vleet, vocational expert ("VE") testified at the hearing.[232] She classified the plaintiff's past relevant work based on listings in the Dictionary of Occupational Titles ("DOT").[233] The VE said the plaintiff's work aligned with the DOT listings for "editor of a magazine" (listing 132.037-022) with a Special Vocational Preparation ("SVP") SVP of 8 and "Journalist" (listing 131.262.018) with an SVP of 7.[234] She characterized the plaintiff's position as an exhibitor-services manager as a combination of "exhibitor" (listing 239.357-101) with an SVP

---

[226] AR 56.

[227] AR 58.

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] AR 59.

[232] AR 25.

[233] AR 60.

[234] AR 60–61. Special Vocational Preparation ("SVP") is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, App. C. 1991 WL 688702 (4th ed. 1991).

of 3 and "sales manager" (listing 163.167-018) with an SVP of 8.[235] She noted that in her job as an editor, the plaintiff sat for "eight plus hours a day and lifted at times up to 20 pounds."[236]

The ALJ presented the VE with the following hypothetical:

> The individual in question can occasionally lift up to 20 pounds, frequently 10. Stand and walk six out of every eight hours. Sit six out of every eight hours. Her pushing is commensurate with her lifting and carrying limitations, however her pulling limitations of 20 occasionally, 10 frequently is limited to frequently. The hypothetical claimant's handling and fingering are also limited to frequently. The hypothetical claimant is to avoid concentrated exposure to extreme cold, extreme heat, vibrations, extreme vibrations, fumes, odors, dust, gasses, poor ventilation or the like. The individual is to avoid even moderate exposure to hazards, hazards being commonly defined as dangerous machinery or unprotected heights. The individual in question cannot perform or work in a fast-paced production environment. . . The individual in question can attend and concentrate at two-hour blocks of time throughout an eight-hour workday provided the individual received the two customary 10 to 15-minute breaks and the 30 to 50-minute lunch period.[237]

The ALJ asked the VE whether this hypothetical individual could do any of the plaintiff's past relevant work.[238] She responded that the work the plaintiff did previously would be "methodical and would fit within the limitations."[239] The ALJ asked, "if an individual for any reason is unable to attend and concentrate in two hour blocks of time throughout an eight hour workday," what effect would that have on the individual's ability to maintain employment.[240] The VE said that person would need "a specially accommodated job and [] would not be considered competitively employable."[241] The VE testified that the allowable range of absences would be "one day per month up to 12 per year. Anything in excess [would mean that] an individual would need either a

---

[235] AR 60–61.

[236] AR 60.

[237] AR 63–64.

[238] AR 64.

[239] Id.

[240] AR 65.

[241] Id.

special accommodation but typically would be terminated if they couldn't adhere to the standards."[242]

The plaintiff's attorney asked the VE how an individual's telecommuting "one to two days per week" would affect the hypothetical raised by the ALJ.[243] She said that "would need to be an accommodation by an employer."[244]

The plaintiff's attorney stated that the plaintiff's "treating psychologist. . . indicated that her ability to understand and remember short and simple instructions [was] markedly limited," and asked, "what effect that would have on the positions that the [VE] indicated under the first hypothetical."[245] The ALJ, the VE and the plaintiff's attorney then had the following exchange:

ALJ: Wait, wait. Counsel, madam VE, does the term marked have any meaning within the definition of the DOT?

VE: No.

ALJ: Counsel, I think you're asking for —

ATTY: Well let me expand then, because —

ALJ: I think I've already done that for you though with the two-hour limitation. See, if she can't attend and concentrate within two-hour blocks of time, we already know she can't work.

ATTY: Well why don't we just cut to the chase then, judge, and if I could just get an agreement that under the limitations set forth by her treating psychologist —

ALJ: Yes, that, yes.

ATTY: — she would be unemployable.

ALJ: And you've already got that as well through Dr. Barry who says she meets a listing so.

ATTY: Dr. Smith.

ALJ: I'm sorry, Dr. Smith.

ATTY: Okay.

ALJ: So, yes.

---

[242] AR 66.

[243] AR 67.

[244] AR 68.

[245] AR 69.

ATTY: All right, so we can —

ALJ: I —

ATTY: — move on.

ALJ: — agree. If she's as limited as these folks say she is, yes.[246]

### 3.3    April 2013 ALJ Decision and Reversal on Appeal

The first ALJ issued an unfavorable ruling on April 1, 2013.[247] Initially, the ALJ determined that the plaintiff met the "insured status requirements of the Social Security Act through December 31, 2013."[248] The ALJ then followed the five-step sequential-evaluation process to determine whether the plaintiff was disabled and concluded that she was not.[249]

At step one, the ALJ concluded that the plaintiff had "not engaged in substantial gainful activity since January 20, 2010, the alleged onset date."[250] At step two, the ALJ determined that the plaintiff had "the following severe impairments: rheumatoid arthritis; Sjogren's syndrome; cervical spine degenerative disc disease; gastritis; and obesity."[251] He held that the plaintiff had the "medically determinable mental impairment of depression" that did not "cause more than minimal limitation in [her] ability to perform basic mental work activities and [was] therefore nonsevere."[252] The ALJ opined, "Clinical signs and findings reported in the case record and consultative examiners Drs. Salk and Marks' opinions support[ed] this determination."[253] He said that the plaintiff's physical-health treatment records did "not document any significant and

---

[246] AR 69–70.

[247] AR 10–19.

[248] AR 12.

[249] AR 12–19.

[250] AR 12.

[251] *Id.*

[252] *Id.*

[253] AR 13.

persistent depressive symptoms," and he discussed examples of the plaintiff's behaving normally and appropriately at medical appointments.[254]

The ALJ assigned "substantial weight" to the state agency consultants' and assigned "little weight" to Dr. Smith's opinion that the plaintiff's depression met the criteria of listing 12.04 and Dr. Furze's opinion that the plaintiff has "disabling depression."[255] He held that the treating doctors' opinions were "inconsistent with the mental status examination findings showing [the plaintiff] had appropriate affect, logical thoughts and was cooperative, and her relatively good activities of daily living . . . including her frequent travel between Arizona and California."[256]

At step three, the ALJ found that the plaintiff did not have "an impairment or combination of impairments that [met] or medically equal[ed] the severity of" a listed impairment because "[n]o physician [] credibly opined that the claimant's conditions [met] or equal[ed] any listing, and the state agency program physicians opined that they [did] not."[257]

Finally, the ALJ determined that the plaintiff had the residual-functional capacity ("RFC") to perform the following work:

> The claimant retains the capacity to lift and carry 20 pounds occasionally, and 10 pounds frequently; stand and walk for 6 hours in an 8 hour workday; sit for 6 hours in an 8 hour workday; pushing is commensurate with the aforementioned lifting and carry limitations; the claimant may frequently pull a weight commensurate with the aforementioned lifting and carrying limitations: 20 pounds occasionally, and 10 pounds frequently; perform frequent handling and fingering; must avoid concentrated exposure to extreme cold and heat, extreme vibration, fumes, odors, dusts, gases and poor ventilation, or the like; avoid even moderate exposure to workplace hazards, such as unprotected heights or dangerous machinery; must not work in a fast-paced production environment; and is able to attend and concentrate for 2 hour blocks of rime throughout an 8 hour workday with the two customary 10 to 15 minute breaks, and the customary 30 to 60 minute lunch period.[258]

---

[254] Id.

[255] AR 14.

[256] Id.

[257] Id.

[258] Id.

Considering the entire record and applying this process, the ALJ found that "[the plaintiff's] medically-determinable impairments could reasonably be expected to cause the alleged symptoms," but held that her "statements concerning their intensity, persistence, and limiting effects" were "not entirely credible. . . ."[259]

The plaintiff appealed the ALJ's decision to the District of Arizona.[260] The district court reversed the Commissioner's decision and remanded the plaintiff's case to the ALJ for further proceedings.[261]

First, the court held that "the reasons cited by the ALJ for discounting Plaintiff's credibility either [were] not supported by substantial evidence of record or otherwise [did] not provide a basis to disbelieve Plaintiff."[262] Second, the court held that the ALJ did not state sufficient reasons for rejecting the opinions of the plaintiff's treating providers (Dr. Barry, Dr. Smith, and Dr. Furze).[263] Third, the court held that the ALJ did not provide germane reasons for rejecting Norman Bell's third-party statement about the plaintiff's disability.[264] Finally, the court held that "the substantial evidence of record at this point, for the reasons stated above, does not support the ALJ's RFC assessment."[265]

## 4. Administrative Hearing Held April 26, 2017

### 4.1 Pre-Hearing Memorandum

The plaintiff submitted a pre-hearing memorandum on April 21, 2017.[266] In it, she said, "The plaintiff has been diagnosed with Rheumatoid Arthritis and treated extensively for it. She also has

---

[259] AR 15.

[260] AR 936.

[261] AR 974.

[262] AR 948.

[263] AR 956–67.

[264] AR 968.

[265] AR 969.

[266] AR 1084.

cervical degeneration and lumbar stenosis with radiculopathy. She has the mental impairment of major depressive disorder with cognitive difficulties."[267] She summarized the plaintiff's medical record as follows:[268]

> The record is replete with objective findings such as limited range of motion, synovitis, effusion, thrush, swelling, edema and multiple instances of fluid on her knee requiring aspirations. Laboratory results repeatedly display elevated inflammatory levels and diagnostics confirm synovitis in her fingers, stenosis in her spine and swelling in her foot. Moreover, the underlying diagnosis of Rheumatoid Arthritis *is complicated* by other conditions and *causes complications*. For example, [the plaintiff] has recurrent chronic bronchitis and sinusitis. During periods of active infections, she must stop the pain saving infusion treatment while she treats the infections. This results in marked increases in her pain levels. Additionally, the medication she takes to help with the pain has caused lupus and agitation, insomnia and fatigue.[269]

The plaintiff asserted that her claim "was mishandled from the beginning," and the "disability examiner was under the wrong impression that the plaintiff's date last insured was 12/31/11 when it was actually two years later. . . ."[270] "[T]hey looked at this from a skewed legal perspective right from the start. Their position was that she had insufficient evidence to prove disability before 12/31/11. This prevented them from looking at any evidence past that date."[271]

### 4.2 Administrative Hearing

An ALJ in California held a hearing on April 26, 2017 to reconsider the plaintiff's application for disability benefits.[272] The plaintiff was represented by an attorney.[273] The plaintiff's attorney explained that there were "four major components" to the plaintiff's conditions: rheumatoid arthritis; complications from rheumatoid arthritis including lupus and infections from suppression of her immune system; a lower-back pain issue that ultimately resulted in surgery (after the initial

---

[267] *Id.*

[268] AR 1084–85.

[269] AR 1085 (emphasis in original).

[270] AR 1086.

[271] *Id.*

[272] AR 871.

[273] AR 873.

hearing in 2013); and major depression.[274] Counsel explained that based on the previous ALJ's specific concerns about the plaintiff's continued travel and Dr. Smith's explanation about why the plaintiff meets the listings, they submitted additional evidence on those topics.[275] Specifically,

> The magistrate [in the District of Arizona] [said] [']I still have some problems with [Dr. Furze's] comments about her grooming and I also have some concerns about the fact that she kept traveling.['] So I had [Dr. Furze] specifically address those in letters and so those have been submitted into evidence, and then he had some issues about what Dr. Smith, his listings comment. But Dr. Smith, her treating psychiatrist said, yes she meets the listings. Magistrate judge says you know, he probably didn't do a very good job about explaining why she meets the listings. So I went back to Dr. Smith and I asked him, can you please just elaborate why do you think that she meets the listing, which he did and again, I provided that explanation into the record, Judge.[276]

### 4.3 Plaintiff's Hearing Testimony

The plaintiff was 53 years old at the time of the second hearing.[277] She last worked in June of 2008, and after that, she supported herself with a 401(k), and help from her father and cousin.[278] What kept her from being able to work was "[t]he inability to concentrate, to read, to follow instructions, and to be consistent in a daily schedule."[279]

The plaintiff's attorney asked her about telling Dr. Furze that she wanted to kill herself and that she did not "really have a reason to live."[280] The plaintiff said she could "get that way from time to time."[281] When asked to give examples about difficulty concentrating, the plaintiff said:

> Trying to read things, I will have to read them seven, eight, nine times and then I still come away with not understanding what it said and I know that I know these words, but I can't put them together. I have done the same thing with trying to watch a television show, having to rewind things four, five, six times to figure out what

---

[274] AR 874–77.

[275] AR 877.

[276] *Id.*

[277] *Id.*

[278] AR 878.

[279] *Id.*

[280] *Id.*

[281] *Id.*

they're saying and I can't keep my mind — my mind gets distracted while I'm trying to focus and I can't keep it on track.[282]

She almost lost her house in Arizona "several times," and her utilities were shut off because she forgot to pay bills.[283] Since 2009, she fumbled with "simple words" and "struggle[d] to find the right word."[284]

She used to be the research director for the Silicon Valley Business Journal.[285] She "interacted with people from other companies" to "get information from them."[286] It was a "sedentary, sit down type of job."[287] The most she had to lift was "maybe five pounds of files."[288] She also worked as an exhibitor services manager for a convention registration company.[289] She "helped people who registered as exhibitors to set up booths in the exhibit hall" and coordinated and managed getting the equipment they needed.[290] She was on her feet 90 to 100% of the day.[291] The most she lifted at that job was 40 pounds.[292]

Her rheumatoid arthritis started spreading in 2002.[293] She received monthly injections for rheumatoid arthritis beginning in the summer of 2003.[294] During the period from 2000 to 2013 the plaintiff was receiving monthly Orencia infusions.[295] She needed to go to the hospital "at some

---

[282] AR 879.

[283] Id.

[284] AR 879–80.

[285] AR 880.

[286] AR 880–81.

[287] AR 881.

[288] Id.

[289] Id.

[290] Id.

[291] AR 882.

[292] Id.

[293] Id.

[294] AR 883.

[295] Id.

point Monday through Friday" and could be there for "three to four hours."[296] Her company provided accommodations for her, including a flexible schedule and an ergonomic specialist to give her "a good desk."[297] She was allowed to work late at nights, on the weekends, and from home.[298] She had difficulty typing and could type from five to 20 minutes before needing to stop because of "a very intense ache" in her hands and her wrists.[299] She needed to "get up and move around for a few minutes" before typing again.[300] She could work like that for two or three hours a day.[301] She had to stop after two to three hours because she experienced "numbness and tingling" down her arms and in her hands which caused her to "lose sleep."[302] She had "back problems and neck problems" diagnosed as stenosis in her back.[303] She could sit for 20 minutes at a time with a lot of shifting and could walk for 15 to 20 minutes at a time before needing a rest."[304]

In 2013, the plaintiff had surgery, which provided her relief for "a couple of months" until she "took a fall."[305] She was told that "disc material could come out again after that surgery[,] and that is what happened after [she] fell."[306] She said that her "rheumatoid arthritis[,] . . . cognitive problems from depression[,]" and gout were the "biggest things" for her.[307]

---

[296] AR 883–84.

[297] AR 882–83.

[298] AR 884.

[299] AR 884–85.

[300] AR 885.

[301] *Id.*

[302] *Id.*

[303] AR 885–86.

[304] *Id.*

[305] AR 886–87.

[306] AR 887.

[307] *Id.*

### 4.4 Vocational Expert

Ms. Wenz, a Vocational Expert ("VE"), testified at the hearing.[308] She characterized the

plaintiff's past work as follows:

> [T]here were two areas of previous employment within the last 15 years that are
> reflected in the file and were discussed in today's hearing. One would be that of
> exhibit services manager. This would be best defined by DOT code 297.367-010,
> and the DOT defines that as light work with an SVP of 5. [The plaintiff] also
> worked as a research director. This is DOT code 189.177-010, and it is light work
> with an SVP of 8.[309]

The ALJ provided two hypotheticals for the VE to consider.[310] The first was:

> [F]or an individual with the same age, education, work background [as the
> plaintiff]. This person will be limited to light work, but all postural including
> climbing, balancing, kneeling, crouching, and crawling would be occasional.
> Handling and fingering would be frequent. This person must avoid exposure to
> temperature extremes as well as vibration, fumes, odors, dusts, gases, and poor
> ventilation. This person should also not be exposed to hazards or unprotected
> heights. Work should not be in [a] fast paced production environment.[311]

The VE testified that hypothetical person could not perform the plaintiff's past work because

both positions required "the ability to work at a fast pace and maintain focus [and]

concentration."[312] The VE provided three alternative occupations for such a hypothetical person: a

furniture-rental clerk[313] (light work with an SVP of 2 and 50,000 jobs nationally); a photocopy

machine operator (light work with an SVP of 2 and over 18,000 jobs nationally); or an order

caller[314] (light work with an SVP of 2 and over 10,000 jobs nationally).[315] The ALJ's second

hypothetical was "[f]or a person with the same age, education, and work background limited to

---

[308] *Id.*

[309] AR 888.

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] The transcript reflects that the ALJ reported this as a "film-rental clerk." AR 860.

[314] The ALJ reported this as a "mail handler." AR 861.

[315] AR 888–89.

essentially sedentary work, but they can only work for three hours a day and two days per week."[316] The VE said there would not be any work for such a hypothetical person.[317]

The plaintiff's attorney then questioned the VE.[318] First, she asked whether a person "markedly limited in the ability to perform activities within a schedule, maintain regular independence, and be punctual. . . would [be] render[ed] [] unemployable?"[319] The VE said yes.[320] The plaintiff's attorney asked whether a person "markedly unable to sustain ordinary, routine [work] without special supervision" and "markedly limited" in "the ability to make simple work-related decisions" would be unemployable, and the VE answered yes.[321] Finally, the plaintiff's attorney asked whether a person "markedly limited in the ability to complete a work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without more than normal rest periods" would be unemployable, and the VE answered that she would.[322] The VE said that missing more than one day of work a month would "definitely" make a person unemployable and agreed that "adding restrictions of working from home or flexible schedule would require an accommodated position."[323]

### 4.5 Administrative Findings Issued October 27, 2017

The ALJ issued an unfavorable decision on October 27, 2017.[324] Initially, the ALJ determined that the plaintiff met the "insured status requirements of the Social Security Act through December

United States District Court
Northern District of California

---

[316] AR 889.

[317] Id.

[318] Id.

[319] Id.

[320] Id.

[321] AR 889–90.

[322] AR 890.

[323] Id.

[324] AR 849.

31, 2013."[325] The ALJ then followed the five-step sequential-evaluation process to determine whether the plaintiff was disabled and concluded that she was not.[326]

At step one, the ALJ determined that the plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date. . . through her date last insured."[327]

At step two, the ALJ determined that the plaintiff had "the following severe impairments: rheumatoid arthritis, sinusitis, psoriasis, status-post back surgery, carpal tunnel syndrome, pacemaker, obesity, lupus, and depression."[328] The ALJ found that those impairments "significantly limit[ed] the ability to perform basic work activities.[329] The ALJ found that the plaintiff's additional medically determinable impairments — status-post laparoscopic cholecystectomy, sleep apnea, hypertension, hyperthyroidism, left-ankle edema, and pulmonary nodules — were nonsevere.[330]

At step three, the ALJ found that the plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."[331] The ALJ opined, "There is no medical evidence that documents listing-level severity for any physical impairment. No acceptable medical-source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."[332] As for the plaintiff's mental impairment (depression), the ALJ held that it did not meet or equal the criteria of listing 12.04 (depressive, bipolar, and related disorders).[333] The

---

[325] AR 854.

[326] AR 854–61.

[327] AR 854.

[328] AR 855.

[329] *Id.*

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] *Id.* Listing 12.04 includes disorders that "are characterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in function. Symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration,

ALJ considered whether the plaintiff's mental impairment met the "paragraph B criteria" for listing 12.04.[334] The ALJ summarized the criteria as follows:

> To satisfy the 'paragraph B' criteria, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.[335]

The ALJ held that the plaintiff had a "moderate limitation" in understanding, remembering or applying information because she "exhibited a linear thought process during an examination."[336] She had a "mild limitation" in interacting with others because" during an examination, the claimant was cooperative and exhibited good eye contact."[337] She had a "moderate limitation" in concentrating, persisting, or maintaining pace because, again, "she exhibited a linear thought process."[338] Finally, she had a "mild limitation" in adapting or managing herself because she "seemed to have relatively full activities of daily living."[339]

The ALJ considered whether the plaintiff's mental impairment met the "paragraph C" criteria of listing 12.04 and determined that it did not.[340]

> [T]he record does not show a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation

---

pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal." Major depression and depressive disorder are both evaluated under this listing. 20 C.F.R., Pt. 404, Subpt. P, appx. 1 § 12.00(3)(a).

[334] AR 855.

[335] *Id.*

[336] *Id.*

[337] *Id.*

[338] *Id.*

[339] AR 856.

[340] *Id.* Fulfilling the "paragraph C" criteria of listing 12.04 requires "evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R., Pt. 404, Subpt. P, appx. A §12.04(C).

of ability to od basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement.[341]

At step four, the ALJ found that the plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to occasional postural activities, frequent handling and fingering, cannot work around hazards or unprotected heights, is limited to simple work, and cannot perform fast-paced production work."[342] The ALJ opined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. . .."[343] The ALJ wrote that "medical records from January 2013 indicate[d] that [the plaintiff] 'is doing fairly in terms of her [rheumatoid arthritis.'"[344] She noted that the plaintiff had back surgery in November 2013 and "was doing well postoperatively."[345] In April 2010, the plaintiff "reported that she has been doing well" with her drug-induced lupus.[346] The ALJ noted that she took into account the plaintiff's wandering atrial pacemaker and chronic sinusitis when formulating the RFC.[347] The ALJ "considered and accounted for" the plaintiff's obesity and found

---

[341] AR 856.

[342] Id.

[343] AR 857.

[344] Id.

[345] AR 857–58.

[346] AR 858.

[347] Id.

that it did "not affect the claimant's ability to ambulate effectively."[348] She determined that the plaintiff's "respiratory and cardiovascular systems [were] not unduly impaired."[349]

The ALJ gave "some weight" to the plaintiff's allegation of depression, but she held that "the medical record indicates that the claimant's depression does not preclude the performance of all work."[350] The plaintiff reported that she was "doing well on Wellbutrin," and in July 2013, the plaintiff was reported to have "good eye contact, appropriate behavior, and her thought process was linear and logical. It was noted that the claimant still had psychosocial stress, but her depression was stable."[351] The ALJ noted that the plaintiff "described daily activities which [were] not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," including frequent travel between the Bay Area and Arizona, writing fiction, and taking walks.[352] The ALJ discussed Dr. Furze's opinion that the plaintiff's depression rendered her "unable to work," but gave it little weight, stating that "the record [did] not support such extreme limitations" and "the medical record show[ed] that many of the claimant's symptoms [were] well-controlled with medication."[353] The ALJ considered Dr. Smith's opinion that the plaintiff's symptoms met listing 12.04 but granted it little weight as it was "not supported by the medical record."[354] "Specifically," the ALJ opined, "the claimant's activities of daily living and unremarkable objective findings all suggest that the claimant does not meet listing 12.04."[355]

The ALJ considered reports from the plaintiff's former coworkers Karen Zinn and Timothy Roberts.[356] The ALJ found that their reports regarding the plaintiff's limitations at work

---

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] *Id.*

[352] *Id.*

[353] AR 859.

[354] *Id.*

[355] *Id.*

[356] *Id.*

"reveal[ed] that the claimant ha[d] a strong work history and [was] hardworking" and that while they supported a finding that the plaintiff could not do her former work, they did "not suggest that the claimant cannot perform any work."[357]

Finally, at step five, the ALJ determined that there were "jobs that existed in significant numbers in the national economy" that the plaintiff could do.[358]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

---

[357] *Id.*

[358] AR 860.

be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that. . . she is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1099 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

The plaintiff filed a motion for summary judgment and contends that the ALJ erred by:

(1) giving little weight to the opinions of her treating psychiatrist and psychologist;

(2) ignoring the opinions of her treating rheumatologists;

(3) failing to include limitations from third-party statements;

(4) discounting her testimony; and

(5) basing her decision on VE testimony where two of the proposed jobs were inappropriate and the remaining job was not available in significant numbers.[359]

For the reasons set forth below, the court grants the plaintiff's motion and remands the case for reconsideration.

## 1. Whether the ALJ Erred by Assigning Little Weight to the Opinions of the Plaintiff's Treating Psychologist and Psychiatrist[360]

The plaintiff alleges that the ALJ did not provide specific and legitimate reasons for discounting her treating psychiatrist's and psychologist's opinions.[361] She also argues that the ALJ "paraphrase[d]" comments from her medical records in a way that made them appear that she was more active than she really was.[362] The court holds that the ALJ did not give specific and legitimate reasons supported by substantial evidence for discounting the opinions.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).[363] In weighing and evaluating the evidence, the ALJ

---

[359] Mot. – ECF No. 15 at 5.

[360] In its opposition to the plaintiff's motion for summary judgment, the government argues that the ALJ properly discounted these opinions because "[b]oth Dr. Smith and Dr. Furze provided their opinions in 2013, well after Plaintiff's date last insured of December 31, 2011." Opp. – ECF No. 18 at 7. This argument has no merit because the plaintiff's date last insured was December 31, 2013. *See* AR 28–29, 853, 861.

[361] Mot. – ECF No. 15 at 6.

[362] *Id.* at 8.

[363] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, applies based on the date of the ALJ's hearing, November 16, 2016.

United States District Court
Northern District of California

1   must consider the entire case record, including each medical opinion in the record, together with

2   the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see Orn v. Astrue,* 495 F.3d 625, 630

3   (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not

4   affirm simply by isolating a specific quantum of supporting evidence.") (internal punctuation and

5   citation omitted).

6       "In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that

7   guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.,* 528

8   F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. §404.1527). Social Security regulations

9   distinguish between three types of accepted medical-sources: (1) treating physicians; (2)

10  examining physicians; and (3) non–examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v.*

11  *Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more

12  weight than an examining physician's, and an examining physician's opinion carries more weight

13  than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th

14  Cir. 2001) (citing *Lester*, 81 F.3d at 830); *accord Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.

15  1996).

16      "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state

17  clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198

18  (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ

19  finds that the opinion of a treating physician is contradicted, a reviewing court will require only

20  that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the

21  record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and

22  citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's

23  opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing

24  specific and legitimate reasons that are supported by substantial evidence.") (internal quotation

25  marks and citation omitted).

26      Dr. Furze's and Dr. Smith's medical opinions are not contradicted by another doctor's opinion.

27  Thus, the ALJ was required to give clear and convincing reasons supported by substantial

28  evidence before discounting the opinions. *Ryan*, 528 F.3d at 1198.

Dr. Smith's notes and opinions documented objective observations related to the plaintiff's depression including restricted affect and low mood.[364] Dr. Furze reported extensively about the plaintiff's severe depression symptoms including "anhedonia, neurovegetative cognitive impairment, social withdrawal and suicidal ideation."[365] Dr. Furze's most recent assessment was that it was "apparent" that the plaintiff was "unable to work and [was] among the most severely impaired by mental illness patients (outside of psychotic disorders) that [she had] seen in thirty years of practicing psychology."[366]

The ALJ gave Dr. Furze's medical opinion little weight because "the record [did] not support" the recommended restrictions in the opinion, and "many of [the plaintiff'] symptoms are well-controlled with medication."[367] The ALJ gave little weight to Dr. Smith's medical opinion because it was "not supported by the medical record" and the plaintiff's "activities of daily living and unremarkable objective findings all suggest that [she] does not meet listing 12.04."[368] The three reasons proffered by the ALJ do not constitute clear and convincing reasons supported by substantial evidence.

First, "[m]erely stating that a treating physician's opinions are not supported by objective findings is insufficient." *Morganti v. Colvin*, No. C 12–03511 CRB, 2013 WL 1758784 at *6 (N.D. Cal. Apr. 24, 2013) (citing *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings. . . does not achieve the level of specificity our prior cases have required."). To disregard a treating physician's opinion, the ALJ must provide "a thorough summary of the facts, *his interpretations thereof,* and his findings." *Id.* (emphasis in original). The ALJ did not provide the requisite specificity here.

Second, that the plaintiff's symptoms improved with medication is not a clear and convincing reason to discount Dr. Furze's testimony. *See Garrison*, 759 F.3d at 1017. The Ninth Circuit has

---

[364] AR 241–44, 640.

[365] AR 847.

[366] AR 1550.

[367] AR 859.

[368] *Id.*

emphasized that "while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Id.* Incidents of improvement must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id.* (citation omitted). "Caution in making such an inference is especially appropriate when no doctor or other medical expert has opined. . . that a mental health patient is capable of working or is prepared to return to work." *Id.* at 1017–18. Here, Dr. Furze siad that Ms. Hayden's mental disability prevented her from working altogether.

Finally, the ALJ's reference to the plaintiff's activities of daily living is not a clear and convincing reason to discount Dr. Smith's medical opinion. "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citation omitted). The Ninth Circuit has held that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722. Thus, the daily activities cited by the ALJ — traveling to Arizona, writing fiction, and walking — do not constitute clear and convincing reasons to reject Dr. Smith's opinion that the plaintiff meets listing 12.04 and is unable to work.

## 2. Whether the ALJ Erred by Ignoring the Opinions of the Plaintiff's Rheumatologist

The plaintiff contends that the ALJ erred by ignoring the opinion of her treating rheumatologists, Dr. Barry.[369] She argues that the ALJ was "required to explain the reasons for rejecting" the physicians' assessments and did not do so.[370] The court agrees.

As discussed above, in weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant

---

[369] Mot. – ECF No. 15 at 9–10.

[370] *Id.* at 10.

evidence. 20 C.F.R. § 416.927(b). An ALJ may not "reject[] a medical opinion or assign[] it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticize it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13.

At step three, the ALJ said that there was "no medical evidence that documents listing-level severity for any physical impairment" and that "[n]o acceptable medical-source. . . mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.[371] The ALJ did not mention Dr. Barry, who diagnosed the plaintiff's rheumatoid arthritis. Dr. Barry's 2005 letter "is clear that when Plaintiff is in pain caused by RA and pleurisy, she should be permitted to telecommute. . . Dr. Barry's letter was written for the direct purpose of indicating an accommodation of functional limitations related to Plaintiff's employment."[372] The ALJ erred by ignoring Dr. Barry's opinion.

### 3. Whether the ALJ Erred by Not Including Limitations from Third-Party Statements

The plaintiff argues that the erred by not giving germane reasons for discounting the opinions of her former coworkers.[373]

The ALJ must consider "other source" testimony and evidence from a layperson. *Ghanim,* 763 F.3d 1154, 1161 (9th Cir. 2014); *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work") (internal quotation marks and citation omitted). "Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). It is competent evidence and "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). The Ninth Circuit has

---

[371] AR 855.

[372] AR 956–57.

[373] Mot. – ECF No. 15 at 11–12.

United States District Court
Northern District of California

not "required the ALJ to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. An ALJ may "point to" reasons already stated with respect to the testimony of one witness to reject similar testimony by a second witness. *Id.*

The former coworkers testified about the plaintiff's debilitating symptoms and need for accommodations at work. The ALJ did not discount the opinions and instead said:

> All of these opinions are given some weight. They reveal that the claimant has a strong work history and is hardworking. They also suggest that the claimant became unable to perform her past work, although she tried to perform it with accommodations for a long time. This is consistent with the finding below that the claimant is unable to perform her past relevant work. Ms. Zinn's opinion supports the finding that the claimant should be limited to simple work. However, these opinions do not suggest that the claimant cannot perform any work.[374]

The ALJ did not reference the limitations in the RFC portion of her analysis but wrote, "[i]n sum, the above residual functional capacity assessment is supported by the medical evidence, the claimant's activities of daily living, and the record as a whole."[375] Given the court's remand for reconsideration of the medical-opinion evidence, the court remands on this issue as well.

### 4. Whether the ALJ Erred by Discounting the Plaintiff's Testimony

The plaintiff argues that the ALJ found her testimony not credible without providing clear and convincing reasons for doing so.[376] She claims that the ALJ used "boilerplate language found repeatedly in Social Security decisions" and did not identify specific statements by the plaintiff as being "inconsistent" with the medical evidence.[377] The court agrees.

In assessing a claimant's credibility, an ALJ must make two determinations. *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingerfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir.

---

[374] AR 859.

[375] *Id.*

[376] Mot. – ECF No. 15 at 12.

[377] *Id.* at 12–13.

2007) (internal quotations omitted)). Second, if the claimant has produced that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281).

In order to have meaningful appellate review, the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102–03 (9th Cir. 2014) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.") (emphasis in original, internal quotations omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony" (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

The ALJ discounted the plaintiff's testimony because her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."[378]

The ALJ did not identify specifically what portions of the plaintiff's testimony were not credible or specifically identify what medical evidence and other evidence in the record undermined her testimony. This was not a specific, clear and convincing reason for rejecting her testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

---

[378] AR 857.

### 5. Whether the ALJ Erred by Relying on VE Testimony

The plaintiff argues that the VE testimony is not substantial evidence because there are inconsistencies between the VE's testimony as reflected in the transcript and the ALJ's description of the testimony in her written opinion.[379]

A VE's testimony may lose its evidentiary value if the hypothetical posed by the ALJ fails to include a claimant's limitations. *See Ross v. Berryhill,* 711 Fed. Appx. 384, 387 (9th Cir. 2017). Here, the VE's recommendations were based on hypotheticals posed by the ALJ. Those hypotheticals included a few of the physical limitations discussed by Dr. Gesuk and none of the mental limitations discussed by Dr. Furze.[380]

As discussed above, the ALJ committed reversible error in failing to discuss the plaintiff's treating rheumatologist and failed to provide legally sufficient reasons for discounting the plaintiff's testimony and the medical-opinion evidence provided by Drs. Furze and Smith. Thus, "it follows that the hypothetical the ALJ posed to the vocational expert is potentially flawed due to a failure to include the limitations" contained in that testimony. *Id.* (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.")) The court holds that the ALJ erred in relying on this flawed VE testimony.

---

[379] Mot. – ECF No. 15 at 15.

[380] *See* AR 888–89.

**CONCLUSION**

The plaintiff's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment is denied. The court remands the case for reconsideration consistent with this order.

**IT IS SO ORDERED.**

Dated: March 25, 2019

_____
LAUREL BEELER
United States Magistrate Judge